Trenton R. Kashima (SBN 291405)
**BRYSON HARRIS SUCIU**
**& DeMAY PLLC**
19800 MacArthur Blvd., Suite 270
Irvine, CA 92612
Telephone: (212) 946-9389
tkashima@brysonpllc.com

*Attorney for Plaintiffs*

*(Additional Counsel listed on Signature Page)*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER OSTINI, MICHAEL CHAVARRIA, DAVID RAMIREZ, ROBERT PRADO, and STACY PENNING, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>IGN ENTERTAINMENT, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiffs Peter Ostini, Michael Chavarria, David Ramirez, Robert Prado, and Stacy Penning (collectively "Plaintiffs") bring this class action against Defendant IGN Entertainment, Inc. ("IGN" or "Defendant") in their individual capacity and on behalf of all others similarly situated (the "Class Members"), and allege, upon personal knowledge as to their own actions, their counsel's investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     Plaintiffs bring this class action lawsuit against IGN for unlawfully using a pen register device to record and capture the electronic communications of users visiting IGN's website, including the "routing, addressing, or signaling information" transmitted between users' devices and the website operated by IGN.

2.     IGN operates https://www.ign.com (the "Website"), and is a subsidiary of Ziff Davis, Inc. ("Ziff Davis"), its parent company.

3.     When users visit the Website, IGN enables the installation of third-party tracking technologies, including those operated by Google (DoubleClick and Google Analytics Pixels) and Yahoo (collectively, the "Trackers"), on visitors' internet browsers. The Trackers are operated by separate and distinct third parties: Google and Yahoo. Each Tracker collects the Internet Protocol ("IP") addresses of website users and other device-identifier information, such as device type and browser type. IGN, together with the third parties operating these Trackers, uses the collected information to monitor user activity, analyze traffic patterns, and support advertising and marketing efforts.

4.     Because the Trackers capture Website visitors' "routing, addressing, or signaling information," the Trackers constitute a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA"). Cal. Penal Code § 638.50(b).

5.     As discussed more specifically herein, IGN violated Cal. Penal Code § 638.51(a) by installing and using the Trackers without Plaintiffs' prior consent or a court order.

6.     Plaintiffs bring this action to prevent IGN from further violating the privacy rights of individuals, and to recover statutory damages for IGN's violation of Cal. Penal Code § 638.51.

1

CLASS ACTION COMPLAINT

**PARTIES**

7.   Plaintiff Peter Ostini ("Plaintiff Ostini") is a natural person and a resident of California. At all relevant times, Plaintiff Ostini used his personal devices to access and interact with Defendant's Website while located within the State of California. Plaintiff Ostini has an account on the Website and has a Yahoo account.

8.   Plaintiff Michael Chavarria ("Plaintiff Chavarria") is a natural person and a resident of California. At all relevant times, Plaintiff Chavarria used his personal devices to access and interact with Defendant's Website while located within the State of California. Plaintiff Chavarria has an account on the Website and has both a Yahoo account and a Google account.

9.   Plaintiff David Ramirez ("Plaintiff Ramirez") is a natural person and a resident of California. At all relevant times, Plaintiff Ramirez used his personal devices to access and interact with Defendant's Website while located within the State of California. Plaintiff Ramirez has an account on the Website and has both a Yahoo account and a Google account.

10.   Plaintiff Robert Prado ("Plaintiff Prado") is a natural person and a resident of California. At all relevant times, Plaintiff Prado used his personal devices to access and interact with Defendant's Website while located within the State of California. Plaintiff Prado has an account on the Website and has a Yahoo account.

11.   Plaintiff Stacy Penning ("Plaintiff Penning") is a natural person and a resident of California. At all relevant times, Plaintiff Penning used his personal devices to access and interact with Defendant's Website while located within the State of California. Plaintiff Penning has an account on the Website and has both a Yahoo account and a Google account.

12.   Defendant IGN Entertainment, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 114 Fifth Avenue, New York, New York 10011. IGN owns and operates the website https://www.ign.com, a digital media platform focused on video games, entertainment, and technology news.

**JURISDICTION AND VENUE**

13.   This Court has jurisdiction over the subject matter of this Action under 28 U.S.C. § 1332(d), the Class Action Fairness Act. This is a civil action filed as a class action under Rule

2

CLASS ACTION COMPLAINT

23 of the Federal Rules of Civil Procedure. The proposed Class consists of at least 100 members; the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one member of the Class is a citizen of a state different from Defendant.

14.    This Court has personal jurisdiction over Defendant IGN because it has purposefully directed its business activities at California residents, including through the operation of the Website, which targets users in California and collects data from users located within this jurisdiction. Defendant has availed itself of the privilege of conducting business within the State of California, and the claims asserted here arise out of IGN's conduct directed toward California residents, including the installation and use of tracking technologies that captured users' routing, addressing, and signaling information within this State.

15.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) because IGN regularly transacts business in this District and is thus subject to personal jurisdiction in this District, and a substantial part of the events giving rise to this action occurred in this District.

**FACTUAL ALLEGATIONS**

**A.  CALIFORNIA INVASION OF PRIVACY ACT**

16.    The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

17.    As the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its ***simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device***.
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—***the right to control the nature and extent of the firsthand dissemination of his statements***.

3

CLASS ACTION COMPLAINT

*Ribas v. Clark*, 38 Cal. 3d 355, 360–61 (1985) (emphasis added; internal citations omitted).

18.    Individuals may bring an action against the violator of any provision of the CIPA for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

19.    As relevant here, Cal. Penal Code § 638.51(a) prohibits any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

20.    A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

21.    A "trap and trace device" is a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

22.    Simply, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information.

23.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices to Internet technologies.

24.    For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address the email was sent to, and the subject line—because this is the user's outgoing information. On the other hand, if the same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is incoming information being sent to that same user.

25.    Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would

4

CLASS ACTION COMPLAINT

not conflict with the statutory scheme." *In re Google Inc. Gmail Litig.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013).

26.     Thus, based on the expansive language of the statute and the legislative purpose behind CIPA, courts have held that CIPA § 638.50 applies to trackers or third-party services that collect user information on the Internet. Federal courts applying CIPA have repeatedly recognized that tracking software, such as the Google and Yahoo Pixels, falls within the statute's definition of a "pen register." *See Conohan v. Rad Power Bikes Inc.*, No. 25-cv-0106, 2025 WL 1111246, at *6 (C.D. Cal. Apr. 3, 2025) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51.") (quoting *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024)); *In re Meta Pixel Tax Filing Cases*, No. 22-cv-07557, 2025 WL 2243615, at *2 (N.D. Cal. Aug. 6, 2025) (concluding "[t]he complaint makes plausible allegations that Meta 'used' a pen register" because "the complaint adequately alleges that Meta used the Pixel"); *Zarif v. Hwareh.com, Inc., Defendant.*, No. 23-cv-0565, 2025 WL 486317, at *12 (S.D. Cal. Feb. 13, 2025) (agreeing that the "Meta Pixel and similar tracking software" are pen registers); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) ("[T]he IP addresses collected by the [pixel] Trackers fall within the statutory definition of 'addressing' information."); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3 (N.D. Cal. Dec. 12, 2024); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register").

27.     This accords with the fact that "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

28.     Individuals may bring an action against the violator of any provision of CIPA, including CIPA § 638.51, for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

**B.  IGN Violates the CIPA**

29.     To make IGN's Website load on a user's internet browser, the browser sends an

CLASS ACTION COMPLAINT

"HTTP request" (commonly a "GET" request for initial page load) to Defendant's server, where the relevant Website data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions.

30. The server's instructions include how to properly display the Website—*e.g.*, which images to load, what text to display, or what music to play. Here, IGN embedded the Trackers on its Website.

31. In addition, the server's instructions cause the Trackers to be executed within the user's browser. The Trackers then cause the browser to send identifying ("addressing") information to third parties, such as Google and Yahoo.

32. Because, as described below, the Trackers collect users' addressing, routing, or signaling information—IP addresses, Device Metadata, and/or the unique cookie IDs—the Trackers installed by IGN are pen registers.

### 1. Privacy Implications of IP Addresses

33. An IP address serves as a unique numerical label assigned to a device and is commonly written as four numbers separated by periods, such as 192.168.123.132. The original IP addressing system, known as IPv4, allows for only a limited number of address combinations, capping the total at roughly 4.3 billion. As Internet use expanded, this limited supply became inadequate, leading to the development of IPv6. IPv6 significantly expands the available address space by providing approximately 340 undecillion possible addresses. Despite the growing adoption of IPv6, many networks still operate using IPv4.[1]

34. An IP address functions similarly to a telephone number by directing data packets from one device to another. It serves as a necessary identifier for devices on the internet or within a local network and enables communication between those devices.

### a. Public versus Private IP Address

35. A public IP address is one that can be reached from anywhere on the Internet and is assigned by an Internet Service Provider ("ISP"). Each public IP address is globally unique and

---

[1] *See, e.g., The IPv6 Paradox: Why the Internet's Future Protocol Remains in Transition*, IPXO (May 15, 2025), https://www.ipxo.com/blog/the-ipv6-paradox.

6

CLASS ACTION COMPLAINT

is necessary for devices that require direct connectivity to the internet.

36.    Although public IP addresses are unique, they are not "public" in the sense that they are continuously visible or freely accessible to all users. When an individual is not actively transmitting data packets, the public IP address is not disclosed and is not transmitted to the broader internet.

37.    Public IP addresses may be used to ascertain the approximate physical location of a device. For example, services such as ipwhois.io maintain databases that associate IP addresses with geographic regions and often provide information such as the country, city, approximate latitude and longitude, and the internet service provider linked to a public IP address. This geolocation functionality is commonly utilized for online advertising and user identification purposes.

38.    A private IP address is used exclusively within an internal network and cannot be routed over the public internet. The Internet Assigned Numbers Authority ("IANA") reserves specific numerical ranges for private IP address use, including 192.168.0.0 through 192.168.255.255. Because these addresses are isolated from the global internet, identical private IP addresses may be reused across distinct networks. For instance, a residential network in Chicago and an office network in London may both assign the same private IP address (e.g., 192.168.1.1) to their routers without conflict.

39.    The distinction between public and private IP addresses is a foundational feature of modern network architecture. Public IP addresses enable devices to communicate across the global internet, while private IP addresses conserve the finite pool of available addresses by supporting communication within local networks. Critically, private IP addresses do not disclose a user's geographic location, whereas public IP addresses often do and are therefore frequently leveraged for advertising and tracking.

40.    A public IP address is akin to a household landline telephone number, while a private IP address resembles the individual handsets connected to that line, such as "Handset #1" or "Handset #2." Knowing which proverbial handset was used conveys little meaningful information, whereas knowing the telephone number itself can reveal substantially more.

CLASS ACTION COMPLAINT

41.    Little meaningful information can be derived merely from determining whether a user accesses a website from a laptop or a smartphone. By contrast, a public IP address can reveal the user's approximate geographic location and identify the router through which the communications are transmitted, typically associated with the user's home or workplace, and serves as the conduit through which the user communicates with a website and the Internet at large.

42.    Therefore, a public IP address is "routing, addressing, or signaling information."

43.    A public IP address is "addressing" information because it can be used to approximate geographic location through commercially available geolocation databases.

44.    A public IP address constitutes "routing" or "signaling" information because it directs communications from a user's router to the destination server on the Internet and helps ensure that data is forwarded to the correct location. Internet Protocol (IP) attaches addressing and routing information to each packet of data so that it can travel across networks and arrive at its intended destination.[2]

### b. Privacy Implications of Public IP Addresses

45.    Through a public IP address, a device's location, including its state, city, and approximate latitude and longitude, can be identified. As a result, knowledge of a user's public IP address and corresponding geographic location allows advertisers to deliver ads with increased specificity, "ensuring relevance and maximizing impact" by tailoring marketing to users based on location.[3]

46.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and . . . postal code"[4] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[5] In fact, IP targeting "is 50 to

---

[2] *What is Routing?*, CLOUDFARE, https://www.cloudflare.com/learning/network-layer/what-is-routing.
[3] Megan Prichard, *How to Use IP Geolocation for Business*, IPINFO, https://ipinfo.io/blog/how-to-use-ip-geolocation-api.
[4] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.
[5] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbertwilliams-z7bhf.

8

CLASS ACTION COMPLAINT

100 times more targeted than traditional media"[6] because "[c]ompanies can use an IP address . . . to personally identify individuals."[7]

47.    Public IP addresses are commonly used in "geomarketing," which is defined as "the practice of using location data to serve marketing messages to a highly targeted audience."[8] "Essentially, geomarketing allows you to better serve your audience by targeting them based on location-related factors, enabling you to tailor your marketing to the products or services that appeal to their needs."[9] For example, when promoting a job fair in a particular city, companies can limit advertisements to users located within the general geographic area of the upcoming event.[10]

48.    "IP targeting is a highly effective digital advertising technique that allows advertisers to deliver ads to specific physical addresses based on their IP address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[11]

49.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on broader demographic or behavioral data."[12]

50.    In addition to reaching their target audience with greater precision, businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[13] "By targeting specific households or businesses, advertisers can avoid wasting money on ads that are unlikely to be seen by their target audience."[14]

51.    In addition, "IP address targeting can help businesses to improve their overall

---

[6] Jeff Whitt, *What is IP Targeting and How to Use It to Build a Successful Brand*, THINKDMG, https://thinkdmg.com/what-is-ip-targeting-and-how-to-use-it-to-build-a-successful-brand.
[7] Trey Titone, *The Future of IP Address as an Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.
[8] See, e.g., *Geomarketing Strategies & Tips: The Essential Guide*, DEEP SYNC (Jan. 3, 2025), https://deepsync.com/geomarketing.
[9] *Id.*
[10] *Id.*
[11] IP Targeting, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0 KCQjw1Yy5BhDARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.
[12] *Id.*
[13] Williams, *supra* note 5.
[14] *Id.*

CLASS ACTION COMPLAINT

marketing strategy."[15] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[16]

52.     The collection of IP addresses here is particularly invasive given Google's and Yahoo's status as data brokers. As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his . . . IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[17]

53.     Indeed, as McAfee (a data security company famous for anti-virus software) notes, "data brokers can . . . even place trackers or cookies on your browsers . . . [that] track your IP address and browsing history, which third parties can exploit."[18]

54.     In other words, the collection of IP addresses by a third party is harmful in and of itself, and the third party further compounds that harm by intentionally associating IP addresses with detailed user profiles, tracking the user's activity across the Internet through the use of those IP addresses in conjunction with other data, and aggregating substantial amounts of additional personal information in the process.

55.     For these reasons, under Europe's General Data Protection Regulation ("GDPR"), IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

---

[15] *Id.*
[16] *Id.*
[17] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY 11 (2020), https://stratcomcoe.org/cup loads/pfiles/data_brokers_and_security_20-01-2020.pdf.
[18] Jasdev Dhaliwal, How Data Brokers Sell Your Identity, MCAFEE (June 4, 2024), https://www .mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.
[19] *Is an IP Address Personal Data?*, CONVESIO, https://convesio.com/knowledgebase/article/is-anip-address-personal-data/; see also *What Is Personal Data?*, EUROPEAN COMMISSION, https://co

10

CLASS ACTION COMPLAINT

### 2. The Google and Yahoo Pixels Are "Pen Registers"

56.     IGN owns and operates the Website. The IGN Website is a major entertainment platform that publishes news, reviews, videos, and other media content related to video games, movies, television, and popular culture.[20] Indeed, IGN is one of the most famous entities in video games media, producing content both on its Website and through social media outlets such as YouTube.

57.     As discussed *supra*, when companies build their websites, they often embed or integrate various third-party scripts into the site's code to collect data from users or perform analytics and advertising functions.[21] Frequently, third-party scripts are installed on websites for advertising and tracking purposes.[22]

58.     Moreover, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[23] Here, the ubiquity and fame of Google and Yahoo compound the likelihood that the Trackers are common across the Internet.

59.     IGN has long embedded the Trackers into the code of its Website, including during the period when Plaintiffs and Class Members visited the Website. As a result, when Plaintiffs (and the prospective Class Members) visited the Website, it caused the Trackers to be installed on Plaintiffs' and other users' browsers.

60.     As described below, when a user visits the Website, the Website's code, as programmed by the Defendant, installs the Trackers on the user's browser. This allows third parties—through their respective Trackers—to collect the IP addresses and device metadata of Plaintiffs and Class Members, and track them pervasively across the Internet.

61.     Because users' IP addresses identify the user's outgoing "routing, addressing, or

---

mmission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.
[20] Ziff Davis, Inc., IGN Entertainment, https://www.ziffdavis.com/brands/entertainment/ign (last visited Oct. 31, 2025).
[21] See *Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies . . . .")
[22] *Id.*
[23] *Id.*

11

CLASS ACTION COMPLAINT

signaling information," the Trackers qualify as "pen registers."

62.   The Trackers are also "pen registers" because the unique user ID assigned to each user by the Trackers is used to identify that user and to record the user's "addressing" information.

63.   IGN and the third parties then use the public IP addresses, device metadata, and other information collected and set by the Trackers, including that of Plaintiffs and Class Members, to serve hyper-targeted advertisements and unjustly enrich themselves through the exploitation of this improperly obtained information.

64.   At no time prior to the installation or use of the Trackers on Plaintiffs' and Class Members' browsers did Defendant obtain Plaintiffs' or Class Members' consent for such conduct, nor did Defendant obtain a court order authorizing the installation or use of the Trackers. Indeed, the Google and Yahoo Pixels on IGN's website transmit information immediately when a user visits the Website, before a user has an opportunity to review any privacy policy or decide on any opt-outs.

### a. Google DoubleClick Pixel and Google Analytics Pixel

65.   Defendant enables Google to collect and receive Plaintiffs' and Class Members' addressing information by using the Google DoubleClick Pixel and Google Analytics Pixel on the Website in the manner described above.

66.   Google provides advertising and analytics services, including the Google DoubleClick Pixel and Google Analytics Pixel, which are designed to collect technical identifiers, interaction signals, and usage metadata associated with website activity.

67.   "DoubleClick Digital Marketing . . . is an integrated ad technology platform that enables advertisers to more effectively create, manage, and grow high-impact digital marketing campaigns."[24] This is done through the Google DoubleClick Pixel, which operates using a server-to-server integration similar to Google Ads. Each time a conversion event occurs—such as when a user clicks on an ad or completes a purchase—the website sends a postback to DoubleClick's servers. DoubleClick then responds with a JavaScript Object Notation (a format used to store and

---

[24] Help Center, *DoubleClick Digital Marketing (DDM)*, GOOGLE, https://support.google.com/faqs/answer/2727482?hl=en (last visited Oct. 31, 2025).

CLASS ACTION COMPLAINT

exchange data between a server and a web application) message confirming whether the event is attributed to a particular ad interaction, allowing Google to record, analyze, and optimize advertising performance across users and campaigns.[25]

68.    "Google Analytics is a platform that collects data from websites and apps to create reports that provide insights for businesses."[26] This is done through the Google Analytics Pixel, a snippet of code embedded in a website that tracks how users interact with it, such as "how many users bought an item . . . by tracking whether they made it to the purchase-confirmation page."[27]

69.    Google describes Google Analytics as "a JavaScript tag" that is placed on a website to track visitor activity.[28] This tag performs multiple functions when it runs in a site visitor's browser, including automatically collecting information about the visitor's interactions with the website, such as page views, clicks, and other actions, which are tracked as "events," and transmitting that information, including the visitor's IP address, to Google for measurement and analysis.[29] Similarly, DoubleClick uses code placed on websites to perform tracking and measurement functions by collecting information about user activity and interactions with web pages and transmitting that data to Google.[30]

70.    Google promotes this service as one that can "[m]onitor activity on your site as it happens."[31]

71.    Google's business model relies on partnerships with companies whose websites use the Google Analytics Pixel to monitor user activity.

72.    Through their partnerships, Google receives data generated by user interactions

---

[25] Google Developers, *The DoubleClick Digital Marketing Suite*, GOOGLE, https://developers.google.com/app-conversion-tracking/third-party-trackers/doubleclick (last visited Oct. 31, 2025).
[26] Help Center, *How Google Analytics Works, Support*, GOOGLE https://support.google.com/analytics/answer/12159447?hl (last visited Oct. 31, 2025).
[27] *Id.*
[28] Help Center, *Get Started with Analytics*, GOOGLE, https://support.google.com/analytics/answer/10220869?hl=en&sjid=16938720340861744437-NA (last visited Feb. 3, 2026).
[29] Help Center, *About the Google Tag*, GOOGLE, https://support.google.com/analytics/answer/11994839?sjid=16938720340861744437-NA; https://developers.google.com/analytics/devguides/collection/ga4/events?utm_source=chatgpt.com&client_type=gtag (last visited Feb. 3, 2026).
[30] Google Help, *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482?hl=en&sjid=16938720340861744437-NA (last visited Feb. 3, 2026).
[31] Analytics, *The Finer Points*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/.

CLASS ACTION COMPLAINT

with participating companies' websites, including event parameters, device and browser identifiers, timestamps, IP-based routing information, and information entered through interactions with website features, as shown below:

**Figure 1(a):**



**Figure 1(b):**



CLASS ACTION COMPLAINT

**Figure 2:**

73.   Google then analyzes that data before providing any results to the website operator. On information and belief, Google must access and process the information it analyzes. Accordingly, Google regularly collects, analyzes, and uses Plaintiffs' and Class Members' addressing information collected through Google Analytics.

74.   Once collected, Google may use that information for its own purposes. It "uses the information shared by sites and apps to deliver services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on partners' sites and apps."[32]

75.   Google's products depend on its ability to collect and analyze users' web behavior to deliver targeted ads. It gathers information from thousands of websites and uses it to classify and target consumers based on their interests.

76.   Data from websites like Defendant's is essential to Google's advertising and analytics operations.

---

[32] Privacy & Terms, *Advertising*, GOOGLE, https://policies.google.com/technologies/ads.

15

CLASS ACTION COMPLAINT

77.    In short, Google uses the data it intercepts for its own purposes, including: (i) improving its products and services; (ii) developing new analytics tools; and (iii) analyzing user data to support targeted advertising and data analytics.

### b.  The Yahoo Pixel

78.    Yahoo is a technology company that provides software-as-a-service products, including Yahoo DSP Advertising. Yahoo owns and operates the Yahoo Pixel, which it provides to website owners, such as Defendant.

79.    Yahoo enables companies to place advertisements on other companies' websites and applications through its demand-side platform ("DSP") and facilitates the sale of advertising space by partnering with publishers and supply-side platforms. To accomplish this, Yahoo employs tracking technologies that collect, store, and analyze technical and usage information from website visitors, including those visiting the Defendant's website.

80.    The Yahoo Pixel operates in the same fashion as Google Analytics and DoubleClick by using a code placed on Defendant's website to collect information about users' interactions with the site.[33] When a user visits Defendant's website, the Pixel code runs in the user's browser and records information about the user's activity, which Defendant transmits, including the user's IP address, to Yahoo's servers for tracking, measurement, and analysis purposes.[34]

81.    The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to load a Yahoo tracking pixel on the user's browser. When the pixel loads, the user's browser sends a request to Yahoo's servers that includes the user's IP address and may include other device and browsing information, as shown below:

---

[33] DSP API, *Pixels*, YAHOO, https://help.yahooinc.com/dsp-api/docs/pixels (last visited Feb. 3, 2026).

[34] DSP API, Standard Yahoo Conversion API, YAHOO, https://help.yahooinc.com/dsp-api/docs/standard-yahoo-conversion-api (last visited Feb. 3, 2026).

16

CLASS ACTION COMPLAINT

**Figure 3(a):**



**Figure 3(b):**



82.    The Yahoo Pixel is a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenly*, 684 F. Supp. 3d at 1050.

17

CLASS ACTION COMPLAINT

83.    Further, the Yahoo Pixel is a "device" because "in order for software to work, it must be run on some kind of computing device." *See, e.g.*, *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 958 (N.D. Cal. 2023).

84.    Because the Yahoo Pixel captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for purposes of CIPA section 638.50(b).

### 3. *Defendant Installed and Used the Trackers on Plaintiffs' and Users' Browsers Without Prior Consent or a Court Order.*

85.    Defendant IGN owns and operates the Website. The Website is a digital media platform that publishes articles, videos, and interactive content focused on video games, movies, television, and other entertainment topics.

86.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[35]

87.    These third-party scripts, operated by Google and Yahoo, were embedded primarily for advertising and analytics purposes, enabling those third parties to gather data from every visitor to the Website.[36]

88.    When the same tracking technologies appear on multiple websites, they enable those third parties to build detailed behavioral profiles of users over time, linking user activity across unrelated site domains.[37]

89.    Defendant has incorporated the code for these Trackers into the code of its Website, including during the times when Plaintiffs and Class Members accessed the site. Accordingly, each time a user visited the Website, the Website's code, as programmed and controlled by Defendant, caused the Trackers to be installed on the user's browser.

90.    Upon installation, the Google and Yahoo Pixels collected the IP addresses and device-level data of Website visitors, including those of Plaintiffs and Class Members. This information was transmitted for the purpose of measuring engagement, conversions, and ad performance.

---

[35] Karoliina Ranne, *What Is Third-party Tracking and Its Role in Advertising*, NEXD (Oct. 28, 2024), https://www.nexd.com/blog/third-party-tracking/.
[36] *Id.*
[37] *Id.*

18

CLASS ACTION COMPLAINT

91.     The Trackers also transmitted additional identifiers from users' browsers, such as the user-agent string (revealing browser, operating system, and device type) and persistent identifiers (including cookies and advertising IDs) that uniquely identified each user across sessions and devices.

92.     These combined elements, including public IP address, browser metadata, and persistent identifiers, formed a unique digital fingerprint that allowed Defendant and its third-party partners to track Plaintiffs and Class Members across the Internet for purposes of targeted advertising and behavioral analysis.

93.     Defendant and third parties used this information to analyze Website traffic, conduct audience segmentation, and serve personalized advertisements based on users' activity and location.

94.     At no time prior to installing or using the Trackers on Plaintiffs' and Class Members' browsers did Defendant obtain their consent, nor did Defendant obtain a court order authorizing the installation or use of such surveillance technology. As stated *supra*, the Google Pixel(s) and the Yahoo Pixel on the Website—both of which were embedded in the Website by Defendant—transmitted (and on information and belief, continue to transmit) information and IP addresses the moment a user arrives at the Website, before review of a privacy policy or opt out mechanism is possible.

### 4. Defendant's Conduct Constitutes an Invasion of Plaintiffs' and Class Members' Privacy.

95.     The collection of Plaintiffs' and Class Members' personally identifiable and non-anonymized data through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

As explained above, the Trackers installed on Defendant's Website are designed to collect and transmit users' data for advertising, behavioral profiling, and analytics purposes. Defendant uses these tools to improve its marketing performance and increase revenue, all through the covert collection and disclosure of Plaintiffs' and Class Members' data to third parties. Thus, Defendant's deployment of Google and Yahoo tracking technologies results in the unauthorized interception

19

CLASS ACTION COMPLAINT

and disclosure of users' identifying information for profit, constituting an unlawful invasion of privacy under the California Invasion of Privacy Act.

**C. Experience of Plaintiffs.**

96.    Plaintiffs regularly visited IGN's Website, and have done so throughout the entirety of the class period.

97.    Each time Plaintiffs accessed the Website, the Website's code, as implemented and controlled by Defendant, caused the Trackers to be installed on their browsers. These Trackers collected Plaintiffs' IP address, device metadata, and other identifying information, which were automatically transmitted to Google's and Yahoo's servers.

98.    Defendant, together with Google and Yahoo, used the data obtained through these Trackers to analyze website traffic, evaluate advertising performance, and conduct targeted marketing based on Plaintiffs' browsing activity and general location, all for the purpose of increasing Defendant's and its partners' advertising revenue.

99.    Plaintiffs never gave prior consent for Defendant to install or use Google's or Yahoo's tracking technologies on their browsers, nor were they informed that their communications with the Website would be transmitted to third parties.

100.    Defendant also failed to obtain a court order authorizing the installation or use of these Trackers, as required under Cal. Penal Code § 638.51.

101.    As a result, Plaintiffs' privacy was unlawfully invaded through Defendant's unauthorized installation and use of pen register technologies on the Website.

102.    Although Defendant employs multiple tracking tools, including those provided by Google and Yahoo, they all operate in substantially the same manner: capturing and transmitting Plaintiffs' and Class Members' IP addresses and device identifiers to third-party servers.

103.    At all relevant times, Plaintiffs and Class Members did not consent to the installation or use of these Trackers on their browsers, nor to the interception or sharing of their identifying information.

104.    Accordingly, both Plaintiffs and Class Members have had their privacy invaded by Defendant's violations of Cal. Penal Code § 638.51.

20

CLASS ACTION COMPLAINT

### D. IGN's Arbitration Agreement.

105.    IGN's Arbitration Agreement is included in the company's Terms of Service and forms part of a standardized clickwrap contract governing the use of the website. The Arbitration Agreement is located at https://www.ziffdavis.com/terms-of-use.

106.    Users have no opportunity to negotiate, modify, or waive specific provisions of the Terms of Service, including the Arbitration Agreement. The Terms are presented in a "one-size-fits-all" fashion, with no room for individualized negotiation.

107.    IGN's Terms of Service contain layers of roadblocks designed to deter would-be claimants from presenting meritorious claims to an arbitrator. The Arbitration Agreement is structured in a way that places undue burdens on users, making it significantly more difficult for them to assert and resolve claims arising under the corresponding Terms of Service.

108.    The Arbitration Agreement states that "[a]ny arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted." As such, a reasonable consumer would understand these promises of "individual arbitration" to mean traditional, bilateral arbitration.

109.    However, in addition to a burdensome pre-arbitration notice requirement and 60-day dispute resolution process, the arbitration provision includes a mass filing provision that admits that claims may be delayed while other claims are resolved first.

110.    After promising "individual arbitration," IGN's Terms of Service abandon the same and then add a complex, formal, multi-stage series of mass arbitration procedures, as set forth below:

> **(9) Mass Filing:** If, at any time, 25 or more claimants (including you) submit Notices or seek to file demands for arbitration raising similar claims against the other party or related parties by the same or coordinated counsel or entities, consistent with the definition and criteria of Mass Filings ("Mass Filing") set forth in NAM's Mass Filing Supplemental Dispute Resolution Rules and Procedures ("NAM's Mass Filing Rules," available at https://www.namadr.com/resources/rules-fees-forms/), you and we agree that the additional procedures set forth below shall apply. The parties agree that throughout this process, their counsel shall meet and confer to discuss modifications to these procedures based on the particular needs of the Mass Filing. The parties acknowledge and agree that by electing to participate in a Mass Filing, the adjudication of their dispute might be delayed. Any applicable limitations period (including statute of limitations) and any filing fee deadlines shall be tolled

21

CLASS ACTION COMPLAINT

beginning when the Mandatory Pre-Arbitration Notice and Informal Dispute Resolution Procedures are initiated, so long as the pre-arbitration Notice complies with the requirements in Section 13(2), until your claim is selected to proceed as part of a staged process or is settled, withdrawn, otherwise resolved, or opted out of arbitration.

**Stage One:** Counsel for the claimants and counsel for Ziff Davis shall each select 25 claims per side (50 claims total) to be filed and to proceed in individual arbitrations as part of a staged process. Each of these individual arbitrations shall be assigned to a different, single arbitrator unless the parties agree otherwise in writing. Any remaining claims shall not be filed or be deemed filed in arbitration, nor shall any arbitration fees be assessed in connection with those claims unless and until they are selected to be filed in individual arbitration proceedings as part of a staged process. After this initial set of staged proceedings is completed, the parties shall promptly engage in a global mediation session of all remaining claims with a retired federal or state court judge and Ziff Davis shall pay the mediator's fee.

**Stage Two:** If the remaining claims are not resolved at this time, counsel for the claimants and counsel for Ziff Davis shall each select 50 claims per side (100 claims total) to be filed and to proceed in individual arbitrations as part of a second staged process, subject to any procedural changes the parties agreed to in writing. Each of these individual arbitrations shall be assigned to a different, single arbitrator unless the parties agree otherwise in writing. Any remaining claims shall not be filed or be deemed filed in arbitration, nor shall any arbitration fees be assessed in connection with those claims unless and until they are selected to be filed in individual arbitration proceedings as part of a staged process. After this second set of staged proceedings is completed, the parties shall promptly engage in a global mediation session of all remaining claims with a retired federal or state court judge and Ziff Davis shall pay the mediator's fee.

**Stage Three:** If the remaining claims are not resolved at this time, counsel for the claimants and counsel for Ziff Davis shall each select 100 claims per side (200 claims total) to be filed and to proceed in individual arbitrations as part of a third staged process, subject to any procedural changes the parties agreed to in writing. Any remaining claims shall not be filed or be deemed filed in arbitration, nor shall any arbitration fees be assessed in connection with those claims unless and until they are selected to be filed in individual arbitration proceedings as part of a staged process. Following this third set of staged proceedings, counsel for claimants may elect to have the parties participate in a global mediation session of all remaining claims with a retired federal or state court judge.

**Stage Four:** If your claim is not resolved at this time, then you agree that your claim will be resolved as part of continuing, staged individual arbitration proceedings as set forth below. Assuming the number of remaining claims exceeds 100, then 100 claims shall be randomly selected (or selected through a process agreed to by counsel for the parties) to be filed and to proceed in individual arbitrations as part of a staged process. If the number of remaining claims is fewer than 100, then all of those claims shall be filed and proceed in individual arbitrations. Any remaining claims shall not be filed or be deemed filed in arbitration, nor shall any arbitration fees be assessed in connection with those claims unless and until they are selected to be filed in individual arbitration proceedings as part of a staged process. After each set of 100 claims are adjudicated, settled, withdrawn, or otherwise resolved, this process shall repeat consistent with these parameters. Counsel for the parties are encouraged to meet and confer, participate in mediation, and engage with each other and with NAM (including

22

CLASS ACTION COMPLAINT

through a Procedural Arbitrator) to explore ways to streamline the adjudication of claims, increase the number of claims to proceed at any given time, promote efficiencies, conserve resources, and resolve the remaining claims.

111.   The mass filing provision contains four stages and is triggered when 25 or more users submit related arbitration claims through the same counsel. This provision limits the number of cases that can be arbitrated simultaneously, restricting the arbitration process to 25 cases per side as part of the initial stage and then severely delaying the resolution of other claims.

112.   The complex procedures of the mass filing provision conflict not only with IGN's multiple promises of "individual arbitration," but also with the basic premise of arbitration itself. The informality of an individual, bilateral arbitration procedure is the chief advantage of "arbitration," as that term is used in the Federal Arbitration Act. For instance, the U.S. Supreme Court has held that a "switch" away from bilateral arbitration "sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment. 'In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011) (internal citation omitted).

113.   By repeatedly promising "individual arbitration," IGN dangles the carrot of informality, speed, and efficiency in front of claimants hoping to resolve their claims. But much later in its Terms, IGN completely abandons the informality of bilateral arbitration by creating a convoluted, multi-stage procedure, adding more layers of complexity than would exist in ordinary litigation. This trickery adds to the substantive unconscionability of IGN's mass filing provision.

114.   The limitation on the number of cases arbitrated at once causes delays in resolving individual claims, creating an environment where users are discouraged from pursuing claims due to the extended timeframes and uncertainty about the timely resolution of their disputes. The mass filing provision even states that remaining claims beyond the initial 25 in the first stage "shall not be filed or be deemed filed in arbitration."

CLASS ACTION COMPLAINT

115. Moreover, after the initial stage of arbitration, the mass filing provision mandates mediation before other claims may be prosecuted, and even then, stage two limits the number of claims to 50 per side, the third to 100 per side, and then random selection of 100 cases to proceed individually as part of the fourth stage.

116. Additionally, the class action waiver in the corresponding arbitration provision prevents users from pursuing their claims collectively, forcing them to resolve disputes individually and through the convoluted multi-stage arbitration process. This, when combined with the mass filing provision, further disadvantages users with small claims, as in pen register cases, the costs of arbitration exceed the potential recovery, leaving users with no viable means to seek redress. As a result, users are effectively discouraged from pursuing their claims.

117. The Arbitration Agreement in IGN's Terms of Service is unconscionable as a matter of law.

## CLASS ACTION ALLEGATIONS

118. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed class (collectively, "the Class"), defined as follows:

> **All individuals residing in California who accessed the Website and whose IP addresses were collected by Defendant through the installation, execution, and embedding of the Trackers during the class period.**

119. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

120. Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

121. **Numerosity:** The Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are tens of thousands of individuals (or more) whose routing, addressing, or signaling information was unlawfully intercepted and transmitted to

24

Google and Yahoo through the installation and use of tracking technologies on Defendant's Website.

122.    **Commonality:** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

      a.      Whether Defendant violated Cal. Penal Code § 638.51;

      b.      Whether the Trackers are "pen registers" pursuant to Cal. Penal Code §638.50(b);

      c.      Whether Defendant sought or obtained prior consent, express or otherwise, from Plaintiffs and the Class;

      d.      Whether Defendant sought or obtained a court order for its use of the Trackers; and

      e.      Whether Plaintiffs and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

123.    **Typicality:** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs, like all other members of the Class, visited the Website and had their IP address collected by the Trackers, which were installed and used by Defendant.

124.    **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class, and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

125.    **Superiority and Manageability:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds or thousands of individual actions would require. Class action treatment

CLASS ACTION COMPLAINT

will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts. The above is true with regard to both the Class alleged in this Complaint.

126. Plaintiffs reserve the right to amend or modify any Class definition as this case progresses.

## CAUSES OF ACTION

### COUNT I
**Violation of The California Invasion of Privacy Act, Cal. Penal Code § 638.51(a)**
**(On Behalf of Plaintiffs and the Class)**

127. Plaintiffs repeat and re-allege paragraphs 1–126 as if fully set forth herein.

128. Cal. Penal Code § 638.50(b) prohibits any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

129. A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

130. The Google and Yahoo tracking technologies used on Defendant's Website are pen registers because they are "device[s] or process[es]" that captured the "routing, addressing, or signaling information," specifically, the IP address and device metadata, from the electronic communications transmitted by Plaintiffs' and Class Members' computers or mobile devices. Cal. Penal Code § 638.50(b).

131. Likewise, these Trackers qualify as pen registers because they captured the unique identifiers associated with each user through the electronic communications sent from Plaintiffs' and Class Members' browsers to Google and Yahoo. The unique IDs constitute "addressing" information because they link each Website visitor to the third parties' databases and profiles of that user, therefore allowing the identification and tracking of individual users.

132. At all relevant times, Defendant installed and used the Trackers, which are pen registers, on Plaintiffs' and Class Members' browsers and caused the collection and transmission

26

CLASS ACTION COMPLAINT

of their IP addresses and other signaling information to Google and Yahoo.

133.    Plaintiffs and Class Members never provided prior consent to Defendant's installation or use of the Trackers.

134.    Defendant did not obtain a court order authorizing the installation or use of the Trackers.

135.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendant's violations of Cal. Penal Code § 638.51(a) and seek statutory damages of $5,000 for each violation committed by Defendant.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

a.  For an Order certifying the Class and appointing Plaintiffs and Counsel to represent the Class;

b.  For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint, including the installation and use of tracking technologies that intercept, record, or disclose the routing, addressing, or signaling information of Plaintiffs and Class Members without consent or a court order;

c.  For an award of damages, including, but not limited to, statutory damages of $5,000.00 per class member and per violation of CIPA § 638.51(a);

d.  For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

e.  For prejudgment interest on all amounts awarded; and

f.  Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.

Date: February 16, 2026                    Respectfully submitted:

By:*/s/Trenton R. Kashima*
Trenton R. Kashima (SBN 291405)
**BRYSON HARRIS SUCIU & DeMAY PLLC**
19800 MacArthur Blvd., Suite 270
Irvine, CA 92612
Telephone: (212) 946-9389
tkashima@brysonpllc.com

27

CLASS ACTION COMPLAINT

Robert R. Jimenez(*pro hac vice* forthcoming)
**BRYSON HARRIS SUCIU**
**& DeMAY PLLC**
201 Sevilla Ave., Suite 200
Miami, Florida 33134
Telephone: (786) 206-7896
rjimenez@brysonpllc.com

*Counsel for Plaintiffs and the Class*

28

CLASS ACTION COMPLAINT